## Case No. 15,029.

### UNITED · STATES v. EIGHT CASES OF LAMPS.

[1 Hunt, Mer. Mag. 252.]

District Court, S. D. New York. Jan., 1839.

CUSTOMS DUTIES—FRAUDULENT INVOICES—BURDEN OF PROOF—PROVINCE OF JURY.

[1. If the government shows that the invoice price is far below the market price, this is sufficient to place the burden on the importer to show what price he actually paid, and, if he does not do so, the jury are warranted in inferring that the invoice was falsely made up.]

[2. If the evidence shows that the market price is not much above the invoice price, the jury may consider whether the difference is greater than the ordinary fluctuations of the market, or what might arise from the necessities of the seller, the state of the times, etc.]

[This was an action for the forfeiture of eight cases of lamps imported from France in June, 1838, per the ship Louis Phillip, and consigned to Augustine Draconi.]

Forfeiture of goods for undervaluation.

The articles were what are called mechanical lamps, having in the interior of the lamp a machinery and movements similar to those of a clock, by which the oil is at all times so forced up to the wick, that the lamp gives a much brighter and more beautiful light than ordinary lamps. The bodies of the lamps were entered in the invoice at 30 francs each, and the suspension frames, globes, and other appendages, were all entered in the invoice at various specific prices, all of which, it was alleged, were 100 per cent. below the appraised value and the current price of such articles, and that therefore the invoice had been fraudulently made up to defraud the revenue of the United States.

In support of these allegations, several appraisers and other attaches of the customhouse testified that they had examined the articles, and that the value put upon them in the invoice was from 70 to 100 per cent. below their current price. But it appeared that not one of the customhouse officers who had examined the articles had any practical knowledge of the value of or price of such articles, and had formed their opinion only from inference, founded on information they obtained from others. There were also some witnesses called who dealt in lamps, but not in the peculiar sort of lamps now in question, which have been rarely imported into this country. The witnesses could therefore decide upon their value inferentially, and in this way they set a much higher value on some of the articles than they had been set down in the invoice. On the part of the claimant, witnesses were produced who are practically acquainted with the value of such lamps and they valued some of them below the invoice price and others a little above it.

THE COURT charged the jury it would be necessary for them to take the invoice and the appraisement, and compare them together, and then compare these papers with the testimony, and see how far the evidence supported and upheld the invoice or the appraisement. After the jury had done this, they would apply the facts, and draw the proper inferences. It was necessary for the court to lay down the principles of law by which the jury were to be guided in giving their verdict, in order that they should know what they had to decide. It was said that the property in question had been imported in violation of the revenue laws, inasmuch as that the importer, in making out his invoice, had entered the articles at a false valuation. The question, then, for their inquiry was, simply, was the invoice made up with intent to defraud the revenue, by charging the property under its value?

The government had given no direct evidence on the subject. It was competent for them to have shown what the articles cost the importer abroad; and, if the price in the invoice was shown to be less than the purchase price, this would have been direct testimony to show that the invoice was false; and if the party was to have derived advantage from it, the jury would be necessarily called in to say that he had committed a fraud to cheat the revenue. There had been, however, no direct evidence given by the government, and they had endeavored to show that the market value was more than the in-

voice; and, if that had been shown, it was ground for a fair inference that the party had bought them at the current market value, and it would be then incumbent on him to show at what price he had actually purchased them, and, if he did not so do, it would be fair for the jury to infer that the invoice was falsely made up. The case rested mainly on whether the invoice was charged below the fair market value, and the government had endeavored to prove this in various ways. First, they showed the value set upon it by the appraisers; and, although this was, in the first instance, prima facie evidence, to a certain extent, it was not, invariably, evidence of the highest character, as it was not to be supposed that the appraisers were acquainted with the value of all articles which came into this port. And in the present instance it appeared that the appraisers had never been engaged in the sale or manufacture of such articles, or had any practical knowledge of their value, and made it up only from general inquiries. And supposing that the judgment formed from such sources showed a different value to that in the invoice, still that would not be sufficient to prove a fraud. For, if the market or adjudged value of the articles was not much greater than what was in the invoice, then the jury had a right to consider whether the deviations were greater than the ordinary fluctuations of the market, or what might arise from the necessities of the seller, the state of the times, or any other occurrence incidental to mercantile affairs. And, if the testimony showed that the invoice was as nearly right as wrong, then it was the duty of the jury to consider that the importer intended to act rightly towards the government, and they should not impute a fraud to him which the testimony had not clearly established.

Verdict for the claimant.